In re PAUL HARRIS STORES, INC., et al., Debtors in Possession.

Paul Harris Stores, Inc., et al., Plaintiffs,

v.

Expeditors International of Washington, Inc., Defendant.

Bankruptcy No. 00–12467–BHL–II.
Adversary No. 02–0479.

United States Bankruptcy Court, S.D. Indiana, Indianapolis Division.

May 9, 2006.

Paul Harris Stores, Inc. et al., Michael P. O'Neil, Esq., Jeffrey Graham, Esq., and Andrew Kight, Esq., Sommer Barnard Ackerson, PC, Indianapolis, IN, for Plaintiffs.

Thomas S. Hemmendinger, Esq., pro hac vice, Brennan, Recupero, Cascione, Scungio & McAllister, LLP, Providence, RI, and Jeffrey L. Logston, Esq., and James A. Knauer, Esq., Kroger, Gardis & Regas, LLP, Indianapolis, IN, for Defendant.

## ORDER

BASIL H. LORCH III, Bankruptcy Judge.

This matter comes before the Court on Expeditors International of Washington, Inc.'s ["Expeditors"] Motion for Partial Summary Judgment on Plaintiff's Complaint filed on August 29, 2005. The matter was fully briefed on November 11, 2005. Based upon the pleadings and evidence presented, the Court makes the following Findings of Fact:

1. On October 16, 2000 [the "Petition Date"], the Debtors filed voluntary Chapter 11 petitions for relief with this Court

under Title 11 of the United States Code. [Complaint, ¶ 2.]

2. Prior to the Petition Date, Paul Harris Stores, Inc. ["Paul Harris"] operated a number of retail stores, selling women's clothing. [Deposition of Ronald W. Martin, p. 42.] A portion of its inventory was purchased from manufacturers based in Asia. [Martin Deposition, p. 50.]

3. Expeditors is a non-vessel operating common carrier, customs broker, freight forwarder and freight consolidator. [Affidavit of A.J. Tangeman, ¶ 2.]

4. Before the Petition Date, Paul Harris contracted with Expeditors to transport merchandise [collectively, the "Goods"] from manufacturers overseas to the United States and to clear the Goods through U.S. Customs. [Martin Deposition, pp. 54–57.]

5. As used herein, the term "Goods" means merchandise which Expeditors transported to the United States by sea and which Paul Harris purchased on "T/T" (telegraphic transfer) terms and open account credit terms. As a result, Paul Harris paid for the Goods from its own funds and not with borrowed money. [Martin Deposition, pp. 41–42, 54.]

6. In addition to said credit terms, the terms of sale for the Goods provided that all Goods were sold FOB point of origin. [Tangeman Affidavit, ¶ 4.]

7. For accounting purposes, Paul Harris calculated its cost in merchandise (including the Goods) as purchase price, plus transportation costs and Customs duties. [Martin Deposition, pp. 35–36.]

8. To evidence Expeditors' receipt of the Goods for shipment, with respect to all Goods Expeditors issued bills of lading and/or cargo receipts, naming Paul Harris as consignee. [Tangeman Affidavit, ¶ 10.]

9. Expeditors obtained possession, custody and control of the Goods at their points of origin outside the United States, then Expeditors transported the Goods to Indianapolis, Indiana. [Martin Deposition, pp. 30, 75; Tangeman Affidavit, ¶¶ 3, 7 and 8.]

10. The Goods first arrived in the United States in California or Washington State. [Tangeman Affidavit, ¶ 8.]

11. Subsequently, Expeditors cleared the Goods through United States Customs, and delivered the Goods to Paul Harris's warehouse in Indianapolis. [Tangeman Affidavit, ¶¶ 3, 7 and 8; Martin Deposition, pp. 56–57.]

12. At all times while the Goods were en route from point of origin overseas to the Paul Harris warehouse in Indianapolis, Expeditors maintained possession, custody and control of the Goods. [Tangeman Affidavit, ¶¶ 3, 7 and 8; Martin Deposition, pp. 30–32, 75.]

13. The services rendered by Expeditors with respect to the Goods enabled Paul Harris to acquire rights in the Goods and the possession or use of the Goods. [Tangeman Affidavit, ¶ 6; Martin Deposition, pp. 29–33.]

14. On or about March 29, 1996, Paul Harris executed and delivered to Expeditors a credit application [the "Credit Application"], which contained the following provision:

As security for any existing and future indebtedness of the Customer [Paul Harris] to the Company [Expeditors], including claims for charges, expenses or advances incurred by the Company in connection with any shipment or transaction of the Customer, and whether or not presently contemplated by the Customer and the Company, the Customer hereby grants to the Company a continuing lien and security interest in any

and all property of the Customer (including goods and documents relating thereto) now or hereafter in the Company's possession, custody or control or en route (the "Collateral").... [Tangeman Affidavit, ¶¶ 9, 11, and Exhibit A thereto; Martin Deposition, pp. 73–75.]

15. The services which Expeditors performed for Paul Harris were governed by the Credit Application and by the individual contracts for the carriage of goods. [Tangeman Affidavit, ¶ 9; Martin Deposition, pp. 73–75.]

16. Expeditors asserts carrier's liens and security interest in and upon all Goods in its possession, custody or control and in all documents of title related to said Goods. [Answer, ¶ 16, and affirmative defenses ¶¶ 5, 6, 7, 10 therein; Tangeman Affidavit, ¶¶ 9–13 and Credit Application; Martin Deposition, pp. 73–77.]

17. Only Expeditors and LaSalle Bank claim liens or security interests in the Goods. [Martin Deposition, pp. 79–80.] LaSalle Bank alleges that it is still owed several million dollars on account of prepetition loans.

18. LaSalle Bank did not give value to enable Paul Harris to acquire rights in the Goods or to acquire the use of the Goods. [Martin Deposition, pp. 41–42, 54.]

19. No UCC–1 financing statements naming Paul Harris as debtor were of record in the State of California on or before the Petition Date, nor are there any such financing statements of record as of August 4, 2005. [UCC–11 Searches, Appendix to Memorandum in Support of Expeditors' Motion for Partial Summary Judgment on Plaintiff's Complaint.]

20. No UCC–1 financing statements naming Paul Harris as debtor were of record in the State of Washington on or before the Petition Date, nor were there any such financing statements of record in Washington as of August 11, 2005. [UCC–11 Searches, Appendix to Memorandum in Support of Expeditors' Motion for Partial Summary Judgment on Plaintiff's Complaint.]

21. On the 90th day before the Petition Date, the value of the Goods in Expeditors' possession, custody and control was $1,175,580.33, and the amount of Paul Harris's debt to Expeditors was $139,380.94. Thus, on this date, Expeditors was over-secured by not less than $1,036,199.39. [Tangeman Affidavit, ¶¶ 16, 31.]

22. During the 90–day period before the Petition Date, Paul Harris made several payments to Expeditors in payment for Expeditors' services in transporting Goods from overseas to Paul Harris's Indianapolis warehouse, and clearing said Goods through U.S. Customs (collectively, "the Payments"). [Tangeman Affidavit, ¶ 15.] Those Payments totaled $739,071.15. [Tangeman Affidavit, ¶ 15.]

23. The Payments were made by Paul Harris and not by any of the other Debtors. [Martin Deposition, pp. 44–45.]

24. On the date prior to the transfer of each Payment, the value of the Goods in Expeditors' sole possession, custody or control exceeded the amount of Paul Harris's indebtedness. [Tangeman Affidavit, ¶¶ 17–29, 31.] Thus, Expeditors was over-secured on each such date.

25. On the Petition Date, the value of the Goods in Expeditors' possession, custody and control was $1,166,601.62, and the amount of Paul Harris's debt to Expeditors was $122,989.63. Thus, on this date, Expeditors was over-secured by not less than $1,043,611.99. [Tangeman Affidavit, ¶¶ 30, 31.]

26. On the Petition Date, this Court entered an Order Authorizing Debtors to Honor Certain Prepetition Checks or Issue New Checks to Pay for (I) Prepetition

Shipping Charges and (II) Key Merchandise and Other Key Expenses, and Shorten and Limit Notice. Shortly after entry of said Order, Paul Harris paid Expeditors the pre-petition debt of $122,989.63 pursuant to said Order. [Tangeman Affidavit, ¶ 30.][1]

27. On September 27, 2002, the Debtors commenced this adversary proceeding, to recover the amount of the Payments from Expeditors, pursuant to 11 U.S.C. § 547. [Complaint, ¶¶ 9–17.]

28. On December 2, 2002, Expeditors timely filed and served its Answer to the Complaint, in which it disputed the Debtors' allegation that the Payments had a preferential effect and asserted, *inter alia,* that the Payments were not preferential, because Expeditors was a fully secured creditor. [Answer, ¶ 16, and affirmative defenses ¶¶ 5, 6, 7, 10 therein.]

### *Discussion*

Expeditors seeks partial summary judgment on Paul Harris's claims to recover alleged preferential transfers. Summary judgment is appropriate when there exist no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Upon a motion for summary judgment, the Court will view the evidence in the light most favorable to the non-moving party and will draw all reasonable inferences in favor of the non-moving party. *Markel v. Board of Regents of Wisconsin System,* 276 F.3d 906, 911 (7th Cir.2002). The moving party bears the initial responsibility of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

The trustee or the debtor-in-possession may avoid certain pre-petition transfers to creditors as preferences under the authority of 11 U.S.C. § 547(b). The trustee must prove each of the following elements of section 547(b) in order to avoid the transfer of an interest of the debtor in property:

(1) to or for the benefit of a creditor;

(2) for or on account of an antecedent debt owed by the debtor before such transfer was made;

(3) made while the debtor was insolvent;

(4) made

(A) on or within 90 days before the date of the filing of the petition; ... and

(5) that enables such creditor to receive more than such creditor would receive if—

(A) the case were a case under chapter 7 [of the Code];

(B) the transfer had not been made; and

(C) such creditor received payment of such debt to the extent provided by [the Code].

It is the final element, Expeditors asserts, that the Debtor cannot establish.

The issue is whether Expeditors was fully secured at the time the transfers occurred. To answer that question, the Court will first turn to the terms of the contract between the parties. The Credit Application that Paul Harris executed in favor of Expeditors granted the latter "a continuing lien and security interest in any and all property of [Paul Harris] (including goods and documents relating thereto) now or hereafter in [Expeditors'] possession, custody or control or en route (the 'Collateral').. . ." Such language constitutes a valid and binding security agreement. Expeditors also points to the following language contained in the individual contracts

---

1. The Debtors do not seek recovery of this    Court authorized payment.

for carriage of goods, including house bills of lading and forwarder's cargo receipts:

> The Carrier shall have a lien on the Goods, which shall survive delivery, for all freight, dead freight, demurrage, damages loss charges, expenses and any other sums whatsoever payable by or chargeable to or for the account of the Shipper [Paul Harris] under this Bill of Lading and any contract preliminary hereto and the cost and expenses of recovering the same, . . . .

(¶ 19, Expeditors' house bill of lading form.)

> Expeditors shall have a general lien on any and all property (and documents relating thereto) of the Customer [Paul Harris], in its possession, custody or control or en route, for all claims for charges, expenses or advances incurred by Expeditors in connection with any shipments of the Customer. . . .

(¶ 8, Expeditors' forwarder's cargo receipt.)

The Debtor insists that Expeditors' surrender of the goods and documents of title to the Debtors extinguished Expeditors' carrier's lien under the terms set forth hereinabove and because Paul Harris made the challenged payments sometime after the Collateral had already been delivered, it argues that the debt was unsecured at the time of payment. Expeditors, however, is not claiming only a possessory lien on the goods which were delivered to Paul Harris. Expeditors asserts that it was, at all times, in possession of additional goods which provided additional security for payment. Expeditors, in support of its Motion, points to the following data contained in the Affidavit of A.J. Tangeman:

| Date (2000) | Goods in Expeditors' Possession | Less Unpaid Charges | Difference |
|---|---|---|---|
| July 18 | $1,175,580.33 | ($ 139,380.94) | $1,036,199.39 |
| July 19 | 1,175,580.33 | ( 137,190.78) | 1,038,389.55 |
| July 27 | 370,876.89 | ( 144,081.06) | 226,795.83 |
| July 31 | 826,463.29 | ( 144,281.55) | 682,181.74 |
| August 9 | 682,375.27 | ( 185,920.87) | 496,454.40 |
| August 16 | 850,417.04 | ( 181,487.20) | 668,929.84 |
| August 23 | 789,613.38 | ( 246,381.75) | 543,231.63 |
| August 29 | 813,889.67 | ( 146,238.74) | 667,650.93 |
| September 6 | 1,476,827.29 | ( 123,233.55) | 1,353,593.74 |
| September 10 | 1,090,271.63 | ( 122,578.88) | 967,692.75 |
| September 18 | 1,356,540.69 | ( 207,763.30) | 1,148,777.39 |
| September 25 | 1,734,538.76 | ( 260,055.89) | 1,474,482.87 |
| October 3 | 1,244,937.38 | ( 247,955.72) | 996,981.66 |
| October 11 | 1,218,007.55 | ( 127,125.94) | 1,090,881.61 |
| October 16 | 1,166,601.62 | ( 122,989.63) | 1,043,611.99 |

Affidavit, ¶¶ 15–31.

Based upon the foregoing evidence, which has not been controverted by Paul Harris, the Court finds that Expeditors had, at the time the challenged payments were made, a contractual general lien which granted it a continuing lien on any goods in its possession. Because Expeditors was fully secured at the time the prepetition payments were made, Paul Harris cannot establish that Expeditors received more, by virtue of such payments, than it would have received in a chapter 7 liquidation. Because Paul Harris cannot satisfy the test as set forth hereinabove, the Court finds in favor of the Defendant,

and grants summary judgment in favor of the Expeditors on the Complaint.